### STATE EX REL. S. B. MARVIN V. JOHN M. WITHROW.

1. CINCINNATI SCHOOL BOARD LAW UNCONSTITUTIONAL.

Section 3897 Rev. Stat., as amended by act 99 O. L. 585, purporting to change the membership of boards of education in cities of over fifty thousand persons, but in effect applicable only to one of the class, is unconstitutional and void, as being general in character and not of uniform operation.

2. PRESIDENT OF BOARD OF EDUCATION HOLDS OVER UNTIL SUCCESSOR QUALIFIES.

A president of a board of education, performing duties under Secs. 3974, 3980, 3982, 3983, 3984 Rev. Stat., other than presiding at meetings of the board, is an officer within the meaning of Sec. 8 Rev. Stat., and holds over until his successor is regularly chosen and qualifies.

3. OFFICER ENTITLED TO HOLD OVER UNTIL SUCCESSOR IS LEGALLY SELECTED AND QUALIFIED NOT ESTOPPED TO DENY RIGHT OF ANOTHER ELECTED AND QUALIFIED UNDER AN UNCONSTITUTIONAL LAW.

One regularly chosen and qualified as president of a board of education under a constitutional law is not estopped to assert his right to hold over until his successor is regularly chosen and qualified; the fact that another is elected and qualified under an unconstitutional law and has entered upon its duties, under a belief of its validity by both claimants, indicates no intention on the part of the former to abandon his right to hold over or acquiesce in the claim of the other.

[Syllabus approved by the court.]

QUO WARRANTO.

**S. M. Johnson** and **William Thorndyke,** for plaintiff.
**Worthington & Strong,** for defendant.

SWING, J.

This is an action in quo warranto.

The facts which are decisive of the issues are not in dispute. Section 3897 Rev. Stat. passed in 1904, provided that in city school districts the board of education should consist of not less than two members nor more than seven members elected at large, and not less than two nor more than thirty members elected from subdistricts. It further provided that in cities containing a population of less than fifty thousand the board of education should consist of not less than three members nor more than seven members elected at large.

Under the provisions of this act, the five cities of this state having a population of over fifty thousand had, at the time this act was amended, May 9, 1908, boards of education constituted as follows:

Hamilton County.

| CITY SCHOOL BOARDS. | AT LARGE. | SUB-DIS. |
|---|---|---|
| Cincinnati | 3 | 24 |
| Cleveland | 5 | 2 |
| Columbus | 3 | 12 |
| Toledo | 3 | 2 |
| Dayton | 2 | 10 |

This act was amended May 9, 1908 (99 O. L. 585). By this amendment it is provided that in city school districts the board of education shall consist of not less than three nor more than seven members elected at large, provided that in cities having a population of more than fifty thousand persons the board shall consist of not less than two nor more than seven members elected at large, and of not less than two members nor more than twelve members elected from subdistricts. By this act the members to be elected at large from cities is changed from "not less than two to not more than seven at large" to "not less than three to not more than seven," with a proviso that in cities of more than fifty thousand it should consist of not less than two nor more than seven members at large and not more than twelve members from subdistricts. Cities of more than fifty thousand are thus brought within the proviso, whereas in the former act cities of less than fifty thousand were brought within the proviso. It is further provided in the act as follows:

"Provided further that whenever the number of members of the board of education in the school districts of cities which at the last or any subsequent federal census may have a population of more than fifty thousand persons is changed under the provisions of this act, then such board of education shall consist of not less than three members nor more than seven members elected at large by the qualified electors of such city school district."

The effect of this act was to change the board of education in Cincinnati and not in the other four cities in the same class. It deprived the city of Cincinnati from having in its board of education any members from subdistricts, and required the board to have at least three members at large instead of two members at large, which the other cities might have, and which the city of Dayton now has. The act, therefore, does not operate uniformly throughout the state in cities within the same class, and the uniformity is destroyed by force of the terms of the statute, and not by the discretion lodged in the cities themselves.

Nor does this act bring Cincinnati within the provisions of the statute applicable to cities under fifty thousand persons—for the board created by this act contains members at large who were not elected by

### State v. Withrow.

the qualified electors of the city at large, but members at large who were elected from subdistricts and who became members at large by being chosen by lot. The result is that this act applies only to the city of Cincinnati. That it was intended by the legislature to apply only to the city of Cincinnati is certain by the terms of the act when considered in connection with the facts that existed at the time in the different cities of the state. If there could possibly be any question as to this, it is quickly dispelled by reading the house and senate journals at the time of the passage of the act.

Having arrived at this conclusion, little else need be said; nothing by way of argument—for it is now settled law of this state that a law of this character is a law of a general nature and must have a uniform operation throughout the state, as required by Art. 2, Sec. 26 of the constitution.

The Supreme Court of the state having so frequently declared such attempts to violate this wise provision of the constitution to be invalid, it seems somewhat strange that this law was enacted.

It is urged that the office of president of the board of education is not a public office, and therefore Sec. 8 Rev. Stat., which provides that any one holding an office or public trust shall continue therein until his successor is elected or appointed or qualified, does not apply to the relator, his term of office having expired January 1, 1909.

We think, however, that the office of president of the board of education is an office coming under this section. Under Secs. 3974, 3980, 3982, 3983 and 3984, the president performs other duties besides acting as presiding officer at the meetings of the board, and by virtue of his office he performs for the state the important office of executing deeds for real estate, and being the custodian of the bond of the clerk. It would seem to be an office under the holding of the Supreme Court in the case of State v. Anderson, 45 Ohio St. 196 [12 N. E. Rep. 196].

It is further urged that the relator has estopped himself by his conduct in participating under the law in the reorganization of the board. We think this proposition cannot be maintained. Mt. Vernon v. State, 71 Ohio St. 428 [73 N. E. Rep. 515; 104 Am. St. Rep. 783], and the leading case of Turnipseed v. Hudson, 50 Miss. 429 [19 Am. Rep. 15].

It is unfortunate, to say the least, that the affairs of this important board should be placed in this confused condition, and, while we regret it, it is not within our judicial power to prevent it.

It is urged that if the law of 1908 is unconstitutional the law of 1904 is also unconstitutional, but we are not inclined to hold that the law of 1904 is unconstitutional. The law is general in character, and, so far

Hamilton County.

as the terms of the law are concerned, operates uniformly throughout the state. The discretion lodged in the cities as to the number of the members constituting the board does not destroy the uniformity of its operation.

If we are correct in our conclusions, it follows that the relator is entitled to the office.

### Decision on Rehearing.

This case was heard and decided, and on motion for a new trial full time was given for oral argument, and additional briefs have been submitted on both sides. This is justified when the great importance to the public of the question involved is considered.

Before proceeding to a decision of the question at issue the court desires to say, that at the conclusion of the oral argument at the former hearing and the submission of briefs, the court did not understand that further briefs were to be submitted and the decision of the case postponed on that account. The court deemed the case of great importance to the community, and that an early determination by the court of the case would be desirable, especially as the legislature was about to adjourn, and if the court found any defects in the law such defects might be corrected by the legislature before adjournment. With this idea in view the court immediately took up the case and considered it, and the result was the decision heretofore announced. The decision was reached before the additional brief of the relator was handed in.

In our former decision we thought the question raised, that the relator could not be heard in this action by reason of his conduct, was settled by the decision of *Turnipseed* v. *Hudson*, 50 Miss. 429 [19 Am. Rep. 15]. It seemed to us to be directly in point, and that it had the sanction of our own Supreme Court as correct law on the question that it did decide, and therefore we contented ourselves by simply saying that the question was determined by that case; but it is urged with much learning and ability by the learned counsel for the defendant that *Turnipseed* v. *Hudson* is not the leading case on the subject, and that it is not in point in this case.

This question is discussed by counsel under the heading "Acquiescence."

In Herman, Estoppel & Res Judicata, in Chap. 12, Estoppels in Pais and Equitable Estoppels, at Sec. 776, the author says:

"If a person having a right and seeing another person about to commit, or in the course of committing, an act infringing upon that right, stands by in such a manner as really to induce the person committing the

### State v. Withrow.

act and who might otherwise have abstained from it, to believe that he assents to its being committed, he cannot afterwards be heard to complain of the act. This is the proper sense of the term "acquiescence" and in that sense it may be defined "*quiescence*" *under such circumstances as assent may be reasonably inferred from it, and is no more than an instance of the law of estoppel by words or conduct.*"

The decisions in which this term is mostly found are those in cases involving rights to land. We have only found one case in the English cases in quo warranto where this term is used. (There may be many others, however, as we have made no extended search.) It is the case of *The King* v. *Dawes,* 1 W. Bl. 634. Lord Mansfield in deciding that case says:

"Therefore, upon these grounds, taken jointly and not separately (1) the behavior and long acquiescence of the informers knowing the disqualification, and (2) the motive of informers for now moving it, and (3) the probable consequences to the borough of granting this information, we are all of opinion that it would be contrary to the trust reposed in this court by the statute of Queen Anne for quickening the amotion of usurpers to permit these informers to have the assistance of the court in this case thus circumstanced."

The "long acquiescence" in this case was from 1753 to 1767.

In the other English cases to which we have been referred the rule of law that there obtains, we think, is fairly stated by Lord Denman in the case of *The Queen* v. *Greene,* 42 E. C. L. 760, as follows:

"I am of the opinion that the objection here taken is good. It is not necessary to scan particular cases. The principle is that he who has concurred in inducing a party to exercise an office cannot be heard in this court on an application to turn him out of the office."

Williams, J., in the same case says:

"If Brassington, knowing the supposed irregularity in this election, still administered the declaration without which Greene could not act, he cannot now complain that Greene is acting."

It cannot be claimed that Marvin knew that this law was invalid. His conduct was brought about by the terms of the statute, and Withrow took the office, not by reason of the conduct of Marvin, but because as he thought the law authorized it, and which he still claims is authorized by it and which he claims is valid.

It is not necessary to set out the facts in *Turnipseed* v. *Hudson,* nor to refer to the different propositions contained in the syllabus. The force of the argument on which the decision rests is found in the latter part of the decision and is as follows:

"The true rule is a case like the one before the court would seem to be that in order to create a vacancy the party must permanently disable himself from performing the duties of the office, either by himself or deputy, or he must by acts and declarations manifest a clear intention to willfully abandon the office and its duties, an intention not shown by the record.

"Holding the order of the board of supervisors declaring a vacancy in the office in dispute standing alone unacted upon, to be nugatory, this cause is narrowed down to the single question, whether the delivery by the respondent was a resignation by implication so as to create a vacancy. No determination on the part of the relator to abandon the office, in any sense of that term within the authorities, is manifest. On the contrary he did not desire to vacate. It is apparent that he was deluded by the unwise and illegal statute. * * *

"In view of this discussion the case at bar may be summed up thus: that both parties acted under a delusion caused by what proved to be an illegal statute and a void election; that Hudson acted upon no representation express or concealed of Turnipseed, but upon the statute referred to; and that the relator delivered the office to the respondent, not from a desire purposely or willfully to abandon the office and its duties, but in obedience to a law of the legislature, approved by the governor, and its enforcement threatened by the local district attorney. When the act which has caused this litigation was declared unconstitutional, the relator demanded of the respondent a restoration of the office to which, upon the record and the authorities as they are understood, he was legally and equitably entitled."

It can scarcely be claimed in the case at bar that the defendant was induced to take the office in controversy by any representations made by the relator, or that the relator did anything other than manifest a desire and willingness to comply with the act of the legislature, which no doubt at the time he believed and had a right to believe was a valid act. No intention to abandon the office is shown by the relator, and there is a total lack of evidence tending to show that he either induced or tried to induce the defendant to accept the office, either through representations express or implied. If these elements are lacking in the case, it is difficult to see wherein the relator has estopped himself by this conduct from asserting his right herein.

We cannot help but think *Turnipseed* v. *Hudson, supra*, is in point, the only difference being that in that case the law had been declared unconstitutional, and in this case it is sought to declare the law unconstitutional, the rights of the parties in either case depending on the illegality

State v. Withrow.

of the act. But this can make no difference when considering the conduct of the parties with reference to the different acts. At the time the parties acted, both laws were regarded by the parties as being legal, and their conduct must be looked at with this idea in view. Of course in this case, if the law is valid, the relator has no standing in court. His rights depend upon its invalidity, and it seems to us that estoppel by conduct has not been shown.

We adhere to our former judgment in holding the law unconstitutional. Nor do we think much should be added to what was said in the opinion. While the act in question is properly subject to criticism as to its wording, its intention and meaning seem free from doubt. We arrive at this conclusion after giving due consideration to all of the words of the act, taken in connection with the facts that existed at the time and the mischief to be remedied by it. When thus construed it can have but one intent and purpose, and that is, to create in the city of Cincinnati a "small" school board. Courts cannot profess ignorance of facts universally known.

It is equally clear that the intent and purpose of this act was that it should not affect the other four cities placed in the same class by the act of 1904. To hold otherwise would defeat the clear intention of the legislature, and give an effect to the act that was clearly not contemplated. The purpose of this act was to change the school board of the city of Cincinnati, which it then had, and which was a large board consisting of twenty-seven members, to a small board consisting of not less than three and not more than seven members. At the same time it was the intention of the legislature that the other cities in the same class with Cincinnati should not be compelled to change their boards from large to small boards. It follows that it did not operate uniformly throughout the state.

**Giffen** and **Smith, JJ.,** concur.